## Case No. 17,610.

### WICKERSHAM v. SINGER.

[1 McA. Pat. Cas. 645.]

Circuit Court, District of Columbia. July, 1859.

CONSTRUCTION OF PATENT LAWS—COMMISSIONER'S JURISDICTION — INTERFERENCES — PAROL EVIDENCE — LACHES OF INVENTOR — OFFICE PRACTICE.

[1. All the laws on the subject of patents should be construed together, and in a liberal spirit, for the purpose of making the parts of the system consistent and harmonious with one another.]

[2. The commissioner has jurisdiction, under the act of 1839 (section 7), over the question of the abandonment by an applicant of his invention to the public.]

[3. The rule that parol evidence is inadmissible to vary or contradict a written instrument does not apply as against persons who are strangers to the instrument, and not in privity of estate or interest with the parties thereto; and such strangers may always show that any statements or recitals therein prejudicial to their rights are false.]

[4. An inventor of an improvement in sewing machines applied for a patent early in 1851, but withdrew his application shortly afterwards, and took no further steps in the matter until 1858. A subsequent independent inventor, however, obtained a patent in the summer of 1851. Both parties lived in the same city, and were rival manufacturers and venders of sewing machines. The second inventor had first put his machines in use in 1850, and in 1853 they were commonly and notoriously in use and on sale in the city. The first inventor went to Europe in 1854, and returned in 1856. It was proved that on his return the details of the rival's invention were communicated to him in full. He took no action, however, until two years and four months later, when he filed a new application. Held, that by reason both of his presumptive and his actual knowledge, and his supineness in asserting his rights, he had so

acquiesced in the public use and sale as to preclude him from claiming an exclusive right to invention.]

[5. The withdrawal of an application, and the return of $20 of the fee, is not, of itself, an abandonment of the invention to the public. but is an equivocal act, to be interpreted by surrounding circumstances, and affected, upon a second application, by the intervening conduct of the party as respects diligence or neglect and delay, in the same manner as in the case of an original application. Therefore. where an application was filed in 1850. withdrawn in 1851, and not renewed until 1858, and it appeared that a subsequent original inventor obtained a patent in 1851, and put the invention in public use and on sale with the knowledge of the first inventor, and without objection from him, the renewed application by the latter could not be made to relate back to his original application, so as to obviate the effect of his intervening laches.]

[Cited in Re Dedericks, Case No. 3,734.]

[6. The action of the office in twice returning the specifications and drawings to the applicant, because they did not conform to the regulations of the office, is not to be construed as a rejection of the claims, and does not relieve the inventor of the duty of prosecuting his application with due diligence.]

[Cited in Re Dedericks, Case No. 3,734.]

[7. Poverty is not to be accepted as an excuse for delay when it appears that during the period of the delay the inventor was able to find money and friends to prosecute other applications for patents both in this country and England, and even to go to England himself to urge his claims.]

[This was an appeal by William Wickersham from a decision of the commissioner of patents in an interference declared between the appellant's application and the patent of I. M. Singer for improvements in sewing machines.]

B. R. Curtis, for appellant.
Chas. M. Kellar, for appellee.

MERRICK, Circuit Judge. The claim in this case is for two improvements upon sewing machines, the first being for the application of a feed mechanism, consisting of a roughened wheel combined with a spring pressure plate, which enables an operator to sew seams of any shape or curvature with equal facility as straight seams could have been previously made; and the second claim is for placing the feeding wheel in such position that its operative part shall project through the surface of the table of the machine so as to act upon the fabric served in a convenient way for advancing the material to the needle and for disengaging the portion already stitched. The interference is most clearly stated, as is the whole history of the case, in the well-considered report of the revisory board of the office. which forms the basis of the. commissioner's decision. The commissioner, upon that report, decided that Wickersham was the prior inventor of these improvements, but rejected his claim for a patent because of abandonment. laches, and two years' public use by his allowance.

The reasons of appeal present three points of alleged error in that decision: First. That

the commissioner has no jurisdiction to in-quire into and determine upon the matter of abandonment. Second. That there was never an abandonment of the claim by Wicker-sham. Third. That the period of two years' public use, with the knowledge and allow-ance of the applicant, is not to be computed from the date of his present application, but that this is purged by the original applica-tion, made in February, 1850, and withdrawn in 1851 on account of mistaken or erroneous suggestions from the then commissioner. The jurisdiction of the commissioner over the question of abandonment has been repeat-edly asserted by successive commissioners with great force of reasoning, and on two occasions has been unequivocally upheld on appeal by Judge Morsell; first in the case of Mowry v. Barber [Case No. 9,892], and again in the case of Ellithorp v. Robertson [Id. 4,409]. Upon careful consideration of the arguments in this case, I find no ground on which the correctness of those rulings can be impeached. It is said that no power or jurisdiction can be exercised by the com-missioner which has not been granted him by the statutes; that this power has not been expressly granted, and that the policy of the law is to withhold this investigation from him, and to reserve it for settlement by a jury after a patent shall have been granted.

No one will deny that the commissioner must look to the statutes creating his office and defining his duties for every power which he can exercise; but it by no means follows that every power and jurisdiction must, upon the face of the statute, appear in words of express reference and definition. All the laws made upon the same subject are to be construed together, and the meaning of the legislature to be gathered from every part and from the general policy designed to be carried out by the several enactments. A liberal interpretation for the purpose of making the parts of a system consistent and harmonious with one another is admitted to be a proper rule of construction; and in re-gard to the patent laws themselves, the greatest of American judges has declared that they "ought to be construed in the spirit in which they have been made."

Now, the counsel of the applicant admits in his argument that although the commissioner of patents is not mentioned in the seventh section of the act of 1839, nor, so far as the section itself discloses, alluded to in the clause saving to the applicant the effects of any use in public short of two years in dura-tion, yet he must by necessary intendment have the duties prescribed to him by the sixth section of the act of 1836 modified by that section so far as to make it his duty to grant a patent under that sixth section, not-withstanding a public use or sale of the in-vention, unless that public use or sale has continued for more than two years prior to his application. The disability springing out

of abandonment is not only found in this seventh section, but is found in the same clause, and is made an alternative to the vice of two years' public use. If, then, the commissioner is enjoined, although nowhere named in that section, not to reject a pat-ent except on proof that the invention has been in public use or on sale for more than two years, how can the other alternative be discarded from the sentence, to wit, "on proof of abandonment of such invention to the public?" This will be the more apparent if we invert the order of succession of the two parts, and read the latter part of the section with no other change than this in-sertion, as follows: "No patent shall be held to be invalid by reason of such pur-chase, sale, or use prior to the application aforesaid, except on proof that such pur-chase, sale, or prior use has been for more than two years prior to such application for a patent or of abandonment of such inven-tion to the public." Now, considered with reference to the section taken by itself, this inversion of the two parts of the sentence does violence neither to its apparent mean-ing nor to its grammatical construction; and it makes manifest that if to carry out the design of the legislature it be necessary for the true reading of the last branch of the sentence that the words "by the commission-er" be interpolated after the words "no pat-ent shall be held to be invalid," the same interpolation should be extended and ap-plied to the other branch declaring the ef-fect of an abandonment. Indeed, but one reason for so forced a separation of these two matters of inquiry is assigned, which is, that the party ought to have an oppor-tunity afforded him by the emanation of a patent to test this question before a jury, who alone are fitted to try questions involv-ing fraud or intent; and that otherwise, upon error committed by the commissioner, the party would be without remedy; but a reference to the sixteenth section of the act of 1836, and the tenth section of the act of 1839, furnish an answer to this objection. It is there provided that a disappointed ap-plicant may file his bill in equity for re-dress; and according to the course of the court of chancery, if the judge thinks the case proper for a jury he may order an issue to be tried before a jury to enlighten his conscience upon the matters of fact in con-troversy. But were this remedy not open to the party it would be strange indeed to construe the law as requiring the commis-sioner to issue a patent upon a state of case which, when next day made apparent to a court of law or equity, would require that court to pronounce the patent utterly void. It is said that the law never requires vain things to be done; but to require a commis-sioner of patents to issue a worthless and void patent would be worse than vain. It would be to direct that persons should be armed with a warrant under the great seal

of the United States. in order to go into all the courts of justice in the land to hunt down their fellow-citizens with oppressive, idle, and vexatious litigation. A body of laws designed "to promote the progress of science and the useful arts" could never "be construed in the spirit in which they have been made" if the statutes were interpreted so as to produce results like these. I think, therefore, that the first reason of appeal cannot prevail, and that the jurisdiction of the commissioner over the question of abandonment is clear under the seventh section of the act of 1839, and that it is unnecessary to resort in aid of the jurisdiction to the eighth section of the act of 1836, from which indeed strong arguments might be drawn to show that he possessed the power upon an issue of interference if he had it not upon all forms of application for patents.

The controlling principles of law by which the claims of the applicant, under the second and third grounds of alleged error, are to be weighed in connection with the facts disclosed upon the record, may best be stated in the language of the supreme court, as follows: "It is the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public; and this he may do either by express declaration, or by conduct equally significant with language, such, for instance, as acquiescence with public knowledge in the use of his invention by others; or he may forfeit his rights as an inventor by a willful or negligent postponement of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others. Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these." Kendall v. Winsor, 21 How. [62 U. S.] 329. And again, in the often-quoted case of Shaw v. Cooper, 7 Pet. [32 U. S.] 321, the court say: "The acquiescence of an inventor in the public use of his invention can in no case be presumed where he has no knowledge of such use; but this knowledge may be presumed from the circumstances of the case."

The prominent facts of the case are that Wickersham made an application for a patent for sundry improvements upon sewing machines, embracing the two claims now in question, on the 13th of February, 1850. On the 20th, his specifications and drawings were returned to him for the purpose of having them put in proper shape for adjudication. On the 15th of March he transmitted new drawings and specifications, returning at the same time the originals, as instructed. These new specifications and drawings, not purporting to be additional to, but substitutes for, the original, nowhere contained any allusion to the claims now in question. They, too, were returned, because not conforming to the regulations of the office and the express requirements of the statute; and in reference to the claims in this second set of drawings and specifications, the office letter of April 5th, 1850, inclosing them for further amendment in compliance with the terms of the law, suggested that, so far as appeared, only the first of the improvements therein claimed was patentable. Without further attempt to amend his application or to procure any determinate action of the office, the case remained in this predicament until on the 28th of May, 1851, he wrote to the office, withdrawing his application and requesting return of $20 under the law. The amount of $20 was accordingly returned to him on the 12th of June, 1851, after an intermediate letter of the 6th of June reiterating his application for withdrawal and directing the mode of transmitting the $20. From that time to the 2d of October, 1858—the date of his oath to present application—he made no movement towards a renewal of his pretensions before the office, nor, for aught that appears in the testimony, did he make any effort to get others to assist him in prosecuting or renewing the claim. although he made efforts to procure patents for other matters. Meantime, I. M. Singer, the contestant, who appears upon the face of the record to have been likewise a bonafide, original inventor of these same improvements, (and, to say the least of them, in a more complete and better form, if not thereby independently patentable, by the substitution of the roughened or corrugated feed wheel for one armed with numerous sharp-pointed projections,) made applications. dated, respectively, on the 18th of October, 1850, and on the 15th of March, 1851. which, being diligently and persistently urged before the office, resulted in patents of August 12th, 1851, (No. 8,-294,) amended and reissued October 3d, 1855. (No. 278,) covering the first and most important of the two claims, and in a patent of November 4th, 1856, (No. 16,030,) covering the second improvement. Singer's machine was first used in Boston, the place where Wickersham lived in the fall of 1850, (Potter's deposition. eighth interrogatory, and Roper's deposition, eleventh. twelfth. and thirteenth interrogatories.) containing both these improvements. In 1853 Singer's machines were commonly and notoriously in use and on sale in Boston. (See Bradshaw's deposition to re-cross interrogatories 4 and 5.) Did Wickersham know of their use at that time, he being at the same time in the same market a manufacturer and vender of rival sewing machines. as appears by the testimony? (See depositions of Arnold and Butterfield.) And is it fair to presume this knowledge "from the circumstances of the case." to use the language in Shaw v. Cooper? But there is another item of proof to be found upon the records of the patent office and among the files sent to me which seems to have escaped the observation of the counsel on both sides, which proves be-

yond controversy that Wickersham was all this while keenly alive to his interests, conversant with the state and progress of the art, watchful of all competitors, and aware, to say the least that Singer was a manufacturer of sewing machines I refer to his letter of protest to the office, dated March 14th, 1853, in which he objects to Singer's being allowed a patent for an improvement in the use of a straight needle in sewing machines. After all this, it is true that Wickersham went to England in January, 1854, and remained abroad until the close of the year 1855 or beginning of 1856. Whatever knowledge he may have derived of Singer's use of his improvements, is not to be excepted out of his memory nor to be abated from the legal operation of delay in asserting his rights on account of his absence beyond seas for these two years. But suppose it were even so that up to the time of his return from Europe he had no knowledge of the public sale of his improvements, how stands the case afterwards? According to the testimony of Webster (answer to twenty-sixth interrogatory, page 21) and the testimony of Potter (answer to fourth interrogatory, page 55, and to eleventh and twelfth cross-interrogatories, page 57) the inventions of Singer were carefully explained to him by Potter, a party interested in procuring testimony to defend these identical claims, and Wickersham, on the trial in New York in May or June, 1856, was examined as a witness against Singer upon these claims. The witness Potter does indeed say that in any conversation he may have had with Wickersham subsequent to May or June, 1856, he may not have adverted to the points involved in these claims, because they had subsided in importance in regard to the after-stages of the controversy. But he nowhere says in his cross-examination, as intimated by counsel to have been the purport of his answers to the eleventh and twelfth cross-interrogatories, that he had not distinctly explained and unfolded the whole matter to Wickersham in his interviews in the spring; and there is no qualification of Webster's statement that the whole matter was fully disclosed in April, 1856. If, then, Wickersham was all the while alive to the importance and value of his invention, and designed, so soon as pecuniarily able, to renew his application for a patent, it passes human credulity to believe that he did not know in the spring of 1856 of the public use and sale of the improvements in question. If still too poor to renew his application, a cheap and obvious way of asserting his exclusive claims was open to him, viz., by warning Singer that he himself was the original inventor, and notifying him that he still insisted upon his claims and meant to vindicate them at the proper time and in the proper way. But nothing of this sort appears in the testimony, nor is there any word to warn Singer of any exclusive claim of another; but, on the contrary, so far as Singer is concerned, the conduct of those suits and Wickersham's participation in them as a wit-

ness were the broadest proclamation that these improvements were free and common property to the whole world, and that no human being was to be restricted from their free and unbought use

Now, from May or June, 1856, down to October, 1858, two years and four months at the lowest calculation, Wickersham interposes no objection to the public sale and use by Singer of his invention. But it is argued that the power of attorney executed by Wickersham in favor of Henry B. Renwick, dated April 11th, 1856, discloses an assertion of right and a purpose to prosecute his claim to a patent. Potter's deposition to fourteenth cross-interrogatory explains the reason why that instrument was drawn in the form it bears; that the sole object of executing it was to procure Wickersham's drawings and specifications from the patent office, to be used in evidence in the suits of Singer against Grover & Baker and Wheeler & Wilson in New York; and that it was his habit to adopt that form of power for similar purposes. Furthermore, that he never promised Wickersham to renew his application, nor was he ever requested to do so. And Renwick, in answer to the ninth interrogatory, page 60, says that he neither took any steps to procure Wickersham a patent, nor was he ever requested to do so. Potter states, also, in answer to the fourth interrogatory, that when Wickersham signed that power of attorney he expressly said that he wished it understood that they (Grover & Baker and Wheeler & Wilson, or their agents) should pay Renwick, and that he should be put to no expense about it. The learned counsel for the applicant has argued that "if the well-settled rules of law prevail," the purport of this instrument cannot be changed by parol; "and that this document is conclusive to show that within two years after Singer had obtained his first patent Wickersham had not consented or allowed the public use of his invention, but was asserting his right and contemplating its prosecution." There is no such rule of law in regard to written instruments where they are invoked to effect the rights of third persons—strangers to the instrument—and not in privity of estate or interest with the parties thereto, but, on the contrary, parol proof is always open "to third persons who, if it were otherwise, might be prejudiced by things recited in the writings contrary to the truth, through the ignorance, carelessness, or fraud of the parties, and who therefore ought not to be precluded from proving the truth, however contradictory to the written instruments of others." Supreme court of the United States in case of Burreda v. Silsbee, 21 How. [62 U. S.] 169.

From the prominent facts of the case which have been adverted to, it will appear that prior to 1854 the facts and circumstances within reach of Wickersham furnish the strongest presumption of his knowledge of the use in public of this invention as embodied

in the Singer machines; and that in the spring of 1856 knowledge in fact of Singer's assertion of right was communicated to him, and that he so acquiesced in that public use as to prevent him from ever after asserting his exclusive right to the invention, unless his continued supineness is to be purged, in contemplation of law, by the circumstances connected with his first application, so as to carry back and connect by legal relation his present application to the date of his first application in February, 1850. The decisions of Judge Woodbury in the case of Adams v. Edwards [Case No. 53], of Judge Nelson in Wilder v. Gayler [Id. 17,649], and of Judge Grier in Rich v. Lippincott [Id. 11,758], are relied upon as settling by the highest authority that if a first application is withdrawn, either for the sake of the money on account of poverty, or under a mistake—if it was rejected by the office under a mistake and the inventor yielded, but on discovering his mistake, or being better advised, made a new application within a reasonable time—there is in such case no abandonment of his invention, and the second application will relate back to the first. To understand the rulings of these eminent judges it is necessary to advert to the state of facts to which in the instances given their decisions were applied. They were all three given in suits upon the same patent and upon the same state of facts, which were substantially as follows: Daniel Fitzgerald filed an application for a patent for an improved fireproof safe on the 1st of April, 1836, which was rejected in September following; and on the 22d of December he applied for a patent for the combination of a desk and safe, which was granted in August, 1837. Fitzgerald was in partnership with one Sherwood, who applied for a patent for a rotating safe, which was issued in May, 1837. On the 27th of June, 1837, after Sherwood's patent, and pending his application for the desk and safe combined, Fitzgerald wrote to withdraw his first application of April, 1836, and it was withdrawn in September, after his patent for the combined safe and desk was issued. Both Fitzgerald and Sherwood continued to make safes, not using the mechanical contrivances they had patented. In January, 1838, Fitzgerald applied for a patent for a safe substantially the same as his first application, which was rejected and subsequently withdrawn. In March, 1838, Fitzgerald assigned his patent of 1837 to Wilder, and agreed to make all necessary application for improvements and additions. In 1839, April 11th, Wilder, as assignee of Fitzgerald, again applied for a patent for a salamander safe, varying somewhat the description, upon which, after various rejections and modifications of specification, a patent was granted in June, 1853. It appeared also that prior and subsequent to the issue of the patent of August, 1837, Fitzgerald and Wilder had made and sold salamander safes, describing them as patented; and there was also

evidence to show that Fitzgerald claimed and represented to Wilder that his patent of August, 1837, embraced the salamander safe; that when Wilder discovered that the patent did not, as he had supposed, cover the salamander safe, but only the combination of desk and safe, he made efforts to obtain one that would. Upon that state of facts it was held by the several judges above named that if Fitzgerald or his assignee supposed their patent of 1837 covered the invention of a salamander safe, when in fact it did not, and that under that supposition they made and sold safes for more than two years prior to their application of 1839, and that the application of 1839 was filed upon the discovery that their safes were not protected by that patent, and that this application was made with diligence after such discovery,—then the application of 1839 related back to application of 1836, which was erroneously rejected in 1836. The jury found these facts to exist, and thereupon the patent of 1853 was sustained. The precise language which Judge Nelson used in his instruction upon the case may be found at page 585 of 10 How. [51 U. S.] in case of Wilder v. Gayler, and will here be quoted to prevent the office from misapprehending, by reason of the arguments filed in this case, the form of his ruling: "If they (the jury) found that Daniel Fitzgerald was the first and original inventor of said improvement, as set forth in said patent, and had not abandoned or dedicated the same to the public, but had with reasonable diligence pursued his invention till he had perfected the same, and used due diligence in applying for and pursuing his application for a patent until he obtained the same, then he was entitled to recover." Upon that charge and that evidence the finding was for the plaintiff. In other words, the jury ascertained by their verdict that the first application of 1836 was withdrawn by Fitzgerald, upon the idea that the application and patent issued a few months later covered the invention: that he continued uniformly and unremittingly to assert exclusive right over the invention, selling it as patented: that so soon as he discovered that he was mistaken, and that the patent under which he was operating did not cover the invention, the assignee renewed his application and had the mistake corrected—certainly within twelve months, for his assignment bore date March 28th, 1838, and the renewed application was filed April 11th, 1839, and, as appears from other parts of the testimony, this discovery must have been subsequent to August, 1838—the time of a certain contract between Wilder and William Adams and others, which gave rise to the suit before Judge Woodbury.

It appears, then, from these decisions that the withdrawal of an application and the return of twenty dollars—part of the patent fee—is not of itself an abandonment or dedication of one's invention to the public, but is an equivocal act, to be interpreted by surround-

ing circumstances, and to be affected upon a second application by the subsequent conduct of the party—his diligence or his neglect and delay—in the same manner as his conduct is to be weighed in regard to an original application; and so I understand the practice of the office to have been to receive renewed applications, either for the whole or a part of a rejected claim, where good cause and due diligence are shown. The claims of Singer himself in this case show that they were embraced in his first application, omitted from his patents, and afterwards awarded to him—the one in his renewed patent of 1854 and the other upon the crowning of his persistent applications and continued claim down to 1856. With regard to the first, it perhaps more properly falls within the class of reissues under the thirteenth section of the act of 1836 and the eighth section of the act of 1837; but not so with the patent of 1856, which is not a reissue.

How stands the case of Wickersham in this regard? I think it has very properly been argued that there never was any rejection by the office of his claims to the present invention. The law requires explicitly that the applicant shall file a clear and intelligible representation of his invention and claims of novelty in both specifications and drawings, to be signed by him and attested by two witnesses; and when papers are filed without these due formalities, it is the duty of the office to decline to act upon them in their imperfect state, and to return them to the party, with such suggestions as may present themselves for the better information of the party. Certain suggestions were made to Wickersham and communicated by note of February 20th, 1850. A new set of specifications and drawings, by their appearance manifestly substitutional, and not merely additional or amendatory of the first, were shortly forwarded, and these were again returned, for the purpose of being authenticated according to law by office letter of April 5th, 1850. Neither in these specifications or drawings nor in any of the models did the claims now in question appear; and of course in reference to this second set must that office letter be understood; nor, indeed, even so understood, can it be regarded as a final judgment upon his case. He seems to have made no further effort to comply with the law until he withdrew the case. It certainly is not the duty of the office to stand at the elbow of applicants to unfold to them the importance of their inventions and to explain to them everything which they might do to procure a patent. Persons are presumed to possess a reasonable amount of intelligence and acquaintance with the modes of doing business. It would be impossible for the patent office to conduct its varied and multiplied business if its officers were charged with the duty of preparing each man's case for him and watching carefully that he fall into no mistake of fact or law; and should the office itself make a mistake in its judgment upon a case

which does not create a delusion in the mind of the party as to his rights, can he repose upon that mistake, and make it operate as an indefinite excuse to him for delaying the further prosecution of those rights, either by endeavoring to convince the office by claim for rehearing of a palpable error or by resorting to the easy and expeditious means for revising their decision upon appeal, as the statutes provide? Now, that Wickersham was led into no mistake or delusion as to his rights by any supposed decision of the office, is manifest from the testimony of his own witness upon questions put by his attorney. At page 20, deposition of Justus Webster, answer to sixteenth interrogatory, "he (Wickersham) has told me since that he made an application himself, and that it was rejected; he felt very much disappointed, and he thought he was rejected because he made the application himself instead of employing an attorney." Here, by his own admission, he was led into no mistaken opinion of his rights by the action of the office, but distinctly avowed afterwards his full knowledge and confidence in them. The excuse of mistake, then, is taken away from his unbroken repose of more than seven years. But his poverty is assigned as a reason for not applying earlier. The measure of poverty which one must possess before he is required to exercise any diligence to prosecute his rights is not to be found in the statute. It is an excuse very readily made, which yet should not too readily be listened to. If a man be utterly destitute of money and without friends, and incapable thereby of prosecuting an enterprise, much indulgence may be shown him; but where he has the means of carrying on sundry enterprises of a kindred sort, equally demanding money and friends, and does carry them on, his election to pursue those other enterprises will not be regarded in the law as an excuse for delay in the one where valuable rights of others equally meritorious with himself, and, in the outset of their successful struggles, equally poor, are to be prejudiced. An election thus made for his supposed advantage or gratification at the time, according to the plainest principles of equity, must not be invoked for the subsequent detriment of another innocent party. It appears that Wickersham applied for five several patents in this country and for one in England during this period, and that he was not without credit and means to go to England in 1854 in pursuit of success. These repeated applications to the patent office furnish, also, another presumption as to the suggestion made of his ignorance of business, to wit, that he must have become by this frequent intercourse with the office sufficiently conversant with the patent laws and the mode of doing business to vindicate his rights, if they had been deemed by him of sufficient importance. The foregoing comparison of the facts of this case with the facts in the case of Fitzgerald, show that although the doctrine of the relation of a patent to the

initiatory proceedings (a doctrine also familiarly applied in matters of land grant to connect an original claim and survey with a junior patent of land in favor of a diligent party, so as to cut out a senior patent procured upon a junior survey and claim) may be resorted to for the purpose of upholding a patent for a valuable discovery, yet the doctrine will not be applied to a case which does not present the element of "due diligence in applying for and pursuing his application for a patent until he obtains the same."

Upon the points, then, of abandonment and want of diligence and of refusal to connect the present application with that of February, 1850, by relation, and also of the public use of the invention for more than two years with the knowledge and consent of Wickersham, I am of opinion that the judgment of the office was correct.

Now, therefore, I, William M. Merrick, an assistant judge of the circuit court of the District of Columbia, do certify to the Hon. William D. Bishop, commissioner of patents, that having duly assigned a time and place for hearing the above-entitled cause, and having considered the reasons of appeal filed by the appellant and the grounds of the decision of the commissioner in the case, and having attentively examined the testimony and read the arguments filed by counsel for both parties, I do adjudge and determine that the decision of the commissioner upon the points involved in said reasons of appeal be, and the same is hereby, affirmed, and that the application of William Wickersham in the premises be finally rejected.

[For another case involving this patent, see note to Singer v. Walmsley, Case No. 12,900.]